Filed 8/20/25 C.M. v. Superior Court CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| C.M. et al.,<br><br>    Petitioners,<br><br>v.<br><br>THE SUPERIOR COURT OF SAN LUIS OBISPO COUNTY,<br><br>    Respondent;<br><br>SAN LUIS OBISPO COUNTY DEPARTMENT OF SOCIAL SERVICES,<br><br>    Real Party in Interest. | 2d Juv. No. B345915<br>(Super. Ct. Nos. 24JD-00286-001, 24JD-00286-002)<br>(San Luis Obispo County) |

C.M. (Mother) and J.E. (Father) petition for extraordinary writ, challenging the juvenile court's order bypassing reunification services and setting the matter for a selection and implementation hearing regarding their son (K.E.) and daughter

(M.E).  (Welf. & Inst. Code, § 366.26;[1] Cal. Rules of Court, rule 8.452.)  We deny the petitions.

FACTUAL AND PROCEDURAL HISTORY

*K.E.'s injuries*

In December 2024, the San Luis Obispo County Department of Social Services (the Department) was contacted by the Valley Children's Hospital (the Hospital) reporting that six-week-old K.E. was admitted to the intensive care unit with head injuries consistent with abuse.  K.E. had two skull fractures, multiple brain bleeds, and bleeding in the spinal column.  He was experiencing seizures and difficulty breathing.  He also had rib fractures and a wrist fracture that were older injuries and healing.

During interviews with law enforcement and a social worker, Father said that he was holding K.E. when he turned quickly, resulting in K.E. hitting his head on a wooden door.  The impact was significant enough that the door "flung back and hit the wall."  Immediately after K.E. hit his head, he extended all of his limbs for two to three minutes, then relaxed.  Mother reported she was washing dishes and heard K.E.'s head hitting the door.  She said K.E. had a lump on his head and appeared pale.  The parents transported K.E. to a hospital instead of calling 911.

Father and Mother also mentioned an incident in November 2024 when K.E. was about four weeks old.  Mother reported she and Father were bottle-feeding K.E. when he began to choke on milk.  K.E. became unresponsive and stopped breathing.  Mother said she performed CPR on K.E., using a two-finger chest compression and then turned him over and gave

_____

[1] Further unspecified statutory references are to the Welfare and Institutions Code.

him three "back slaps."  They called 911, and emergency medical services (EMS) and law enforcement responded.  EMS recommended they transport him to the hospital, but the parents decided not to because K.E. had a pediatrician appointment three days later.  The parents explained the choking situation was similar to what had occurred with their daughter, D.E., who died when she was two months old in June 2023.

When asked about the broken wrist and ribs, Father said he was unaware of those fractures.  He asked if the rib fractures could have been the result of the CPR and if K.E. potentially had "Osteogenesis Imperfecta" (O.I.) or "Brittle Bone Disease."  He said D.E. had the same condition, which contributed to her death.  Mother also reported that D.E. was diagnosed with O.I. after she died.

Dr. Sindhura Kodali, a doctor with the Hospital's Child Advocacy Clinic, assessed K.E. and reported that his injuries indicated multiple points of impact, consistent with child abuse.  K.E. remained in a critical state and suffered permanent brain injury.  Dr. Kodali reported that the parents' explanation of the injuries (both the November and December 2024 incidents) was not consistent with the actual injuries K.E. suffered.  She said that the location of the skull fracture is "not completely in line" with where the parents said K.E. bumped his head and "the additional skull fracture is on the opposite side of the head, which could not have been from the same incident."  Furthermore, the "multiple rib fractures on the left side of [K.E.]'s body were consistent with forceful squeezing and could not have been the result of CPR or back blows."  The wrist fracture was "very specific to forceful bending and there are no alternative situations in which this type of fracture could occur in an infant."

3

Dr. Kodali further described the type and location of the brain and spinal cord bleeding to be "only consistent with forceful shaking or whiplash and a direct impact or blow to the head." K.E. also underwent genetic testing, which concluded that he did not have any conditions contributing to his injuries, including O.I. Dr. Kodali also contacted the coroner who performed D.E.'s exam, and they confirmed that D.E. was not diagnosed with O.I.

In late December 2024, K.E. was released to a foster home. As of March 2025, doctors reported that K.E. was healing but that he could suffer developmental delays. His three-year-old sister, M.E., was placed with the maternal grandmother.

*Prior dismissed dependency matter—D.E.*

In June 2023, the Department was contacted when two-month-old D.E. was admitted to the Hospital with injuries believed to be consistent with child abuse, including head injuries (bilateral retinal hemorrhaging and brain injury) and rib fractures in various stages of healing. Father reported he was feeding D.E. when he heard her inhale something in the wrong direction and she went limp. D.E. passed away after a few days on life support. M.E. was taken into protective custody. The Department filed a dependency petition.

Later, the autopsy report determined the cause of D.E.'s death was sepsis from a ruptured abscess on her gastrointestinal tract. The doctor who performed the autopsy stated that this condition caused the damage to D.E.'s brain, and, although rare, it could have also caused the bilateral retinal hemorrhaging. The doctor was unable to determine the cause of the abscess or the rib fractures. The report stated that all rib fractures were of the same age in terms of healing and occurred around the time of birth while D.E. was hospitalized for the first three weeks of her

life.  The doctor also confirmed that D.E. had no genetic conditions or predispositions for any condition that would result in bone fragility, including O.I.  The doctor reported the parents suggested that D.E. had O.I., but he informed them D.E. did not have this condition.  The autopsy report stated that D.E.'s vitamin D levels were low, but not "shockingly" low at the time of the autopsy.

Following the autopsy, the Department requested M.E. be returned to her parents and the dependency petition filed in June 2023 be dismissed.

*Current petition and jurisdiction/disposition hearing*

The Agency filed an amended dependency petition alleging that Mother and Father failed to protect both K.E. and M.E. (§ 300, subd. (b)), severe physical abuse of K.E., a child under five years old (*id.*, subd. (e)), and, as to M.E., abuse of a sibling (*id.*, subd. (j)) based on the facts surrounding K.E.'s injuries.  In the disposition report, the Agency recommended the children remain in out-of-home placement, the juvenile court bypass Mother and Father's reunification services as to both children pursuant to section 361.5, subdivision (b)(5) and (6), and the court set a section 366.26 hearing.

At the contested jurisdiction/disposition hearing, social worker Amanda Briley testified that based on her review of K.E.'s medical records and discussions with Hospital doctors, the parents, and family members, there was no explanation for K.E.'s injuries other than nonaccidental trauma.  Briley noted there were inconsistencies in the parents' explanation of K.E.'s injuries, including inconsistencies on how K.E. hit his head on the door versus the door frame.  Briley testified that two Hospital doctors,

Drs. Kodali and Abdul Calder, reported the parents' explanation of injuries was inconsistent with the extent of injuries.

Briley also testified that she was concerned with the parents' ability to seek appropriate medical care for their children. M.E. ingested and tested positive for THC, but the parents did not get medical care for her. During the November 2024 incident, the parents told EMS they would transport K.E. to the hospital themselves against EMS advice. K.E. was never taken to the hospital. After K.E.'s head injury occurred, the parents never called 911 and transported him to the hospital themselves. Mother and Father also had a history of marijuana abuse, and when Mother was pregnant with all three children, she was admonished at every appointment to discontinue marijuana use.

Briley testified Mother and Father were engaged in services, including drug and alcohol counseling, and the visitations were going well. Nonetheless, Briley recommended that no reunification services be offered. Without identifying what caused K.E.'s injuries, it would be difficult to tailor services to the parents' needs or assess the parents' behavioral changes to determine if the children could be safely returned. Briley opined that offering reunification services to the parents would not be in K.E. or M.E.'s best interest and bypassing services would not be detrimental to them. Although M.E. had a close and positive attachment to her parents, the concurrent plan is placement with a close relative that would allow M.E. to maintain that relationship.

Several family members and friends testified on behalf of Mother and Father. They testified regarding the parents' positive relationship with their children.

6

At the conclusion of the hearing, the juvenile court sustained all the allegations in the petition, denied reunification services for Mother and Father, and set a section 366.26 hearing. The court found K.E.'s injuries were "consistent with child abuse." It agreed "the explanation by the parents [is] inconsistent with the injuries."

The court found that "[g]iven the history here, as exemplified by the parents not seeking medical care after having conducted CPR on [K.E.] a short time before the December injuries . . . the parents are incapable or unwilling to facilitate appropriate medical care for [K.E.] and his special needs that are the result of injuries inflicted." The court found that the parents were "on notice as to the necessity of medical care," given EMS's directions during the choking incident in November 2024 and the death of D.E. a year earlier. "Despite this knowledge, they were negligent in seeking appropriate medical care for their infant baby." For those reasons, the court found that reunification services would not benefit K.E. or M.E. Specifically as to M.E., the court noted there was "trauma induced by experiencing her sibling being injured and abused, not properly cared for, and this creates a personal heightened risk to [M.E.]."

The court found by clear and convincing evidence that K.E. was brought within the court's jurisdiction under subdivision (e) of section 300 because of the conduct of the parents. (§ 361.5, subd. (b)(5).) The court found that "the parents caused the injuries of the abused child or were complicit in the deliberate abuse." The court found there was no competent evidence to support a finding that services will prevent future abuse or neglect. (§ 361.5, subd. (c)(3).) It credited Briley's testimony that it would be unlikely for reunification services to be successful

7

because the Department did not know what underlying issue had to be addressed. Although the court acknowledged M.E. had a "strong bond" with her parents, "there is not evidence that the bond is so strong that failure to reunify would outweigh the detriment."

The court also found by clear and convincing evidence that services should be bypassed pursuant to section 361.5, subdivision (b)(6)—infliction of severe physical harm of a child or sibling of a child. The court found the infliction of severe physical harm was demonstrated "by both act and omission. The medical information that was provided supports these findings." The court further found reunification was not in M.E. and K.E.'s best interest.

DISCUSSION

*Section 300, subdivision (e)*

Mother and Father contend there was no substantial evidence to support the section 300, subdivision (e) allegation of severe physical abuse of K.E. However, they do not challenge the court's findings as to section 300, subdivisions (b) and (j), and Father concedes the subdivisions (b) and (j) allegations. When a juvenile petition alleges multiple grounds, a reviewing court can affirm the juvenile court's finding of jurisdiction on any one of the statutory bases for jurisdiction. In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by substantial evidence. (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 451.)

Because the section 300, subdivisions (b) and (j) allegations are unchallenged, we need not consider the challenge to the subdivision (e) allegation in order to affirm the juvenile court's finding of jurisdiction. However, we opt to determine the merits

8

of the contention, because the section 300, subdivision (e) allegation is related to the section 361.5, subdivision (b)(5) bypass provisions Mother and Father also challenge.

We review a juvenile court's jurisdictional findings for substantial evidence.  (*In re R.T.* (2017) 3 Cal.5th 622, 633.)  " 'In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court.' [Citations.]"  (*Ibid.*)

Under section 300, subdivision (e), a child comes within the dependency court's jurisdiction where the "child is under five years of age and has suffered severe physical abuse by a parent, or by any person known by the parent, if the parent knew or reasonably should have known that the person was physically abusing the child.  For the purposes of this subdivision, 'severe physical abuse' means any of the following: any single act of abuse that causes physical trauma of sufficient severity that, if left untreated, would cause permanent physical disfigurement, permanent physical disability, or death; . . . or more than one act of physical abuse, each of which causes bleeding, deep bruising, significant external or internal swelling, bone fracture, or unconsciousness . . . ."

Here, substantial evidence supports the true finding on the section 300, subdivision (e) allegation.  K.E., who was only six weeks old at the time of the referral, suffered injuries that constitute "severe physical abuse."  He had significant head and brain injuries, including skull fractures, multiple brain bleeds, and bleeding in the spinal cord, which caused him to be admitted

9

to the intensive care unit in critical condition. There was a likelihood that K.E. suffered permanent brain damage and could have developmental delay as a result of these injuries. He also had wrist and rib fractures that were a few weeks older. The evidence was also sufficient to show that Mother and Father inflicted these injuries or knew or reasonably should have known that someone inflicted these injuries. Dr. Kodali opined that these injuries were consistent with child abuse and that Mother and Father's explanations were inconsistent with the actual injuries. Social worker Briley also testified that based on her review of the medical records and discussion with the parents and doctors, there was no explanation for K.E.'s injuries other than nonaccidental trauma. Briley further noted inconsistencies in the parents' explanation of how the injuries occurred. The juvenile court credited Briley's testimony.

Mother and Father contend the allegation "is rebutted by evidence of the medical history in the record regarding [D.E.]'s case, the similar medical issues of [K.E.], and the lack of any injury to [M.E.]." But on appeal, we will affirm if substantial evidence, *contradicted* or uncontradicted, supports the juvenile court's finding. And we do not determine issues of fact and credibility or reweigh the evidence. (*In re R.T.*, *supra*, 3 Cal.5th at p. 633.) We affirm the allegation because substantial evidence supports it.

*Bypass of reunification services*

Mother and Father contend the juvenile court erred in bypassing reunification services pursuant to section 361.5, subdivision (b)(5) and (6). We again disagree.

Generally, when a child is removed from the parent's physical custody, "the juvenile court shall order the social worker

10

to provide child welfare services." (§ 361.5, subd. (a).) However, "[r]eunification services need not be provided to a parent . . . when the court finds, by clear and convincing evidence" one of the enumerated circumstances under section 361.5, subdivision (b).) (*Id.*, subd. (b).)

When a juvenile court's decision to bypass reunification is challenged, we apply the substantial evidence rule. (*In re Brooke C.* (2005) 127 Cal.App.4th 377, 382.) "We review the record in the light most favorable to the trial court's order to determine whether there is substantial evidence from which a reasonable trier of fact could make the necessary findings based on the clear and convincing evidence standard." (*In re Isayah C.* (2004) 118 Cal.App.4th 684, 694, italics omitted.)

### 1. *Section 361.5, subdivision (b)(5)*

Under section 361.5, subdivision (b)(5), reunification services need not be provided where the court finds, by clear and convincing evidence, that "the child was brought within the jurisdiction of the court under subdivision (e) of Section 300 because of the conduct of that parent." If this bypass provision applies, the court "shall not order reunification . . . unless it finds that, based on competent evidence, those services are likely to prevent reabuse or continued neglect of the child or that failure to try reunification will be detrimental to the child because the child is closely and positively attached to that parent. The social worker shall investigate the circumstances leading to the removal of the child and advise the court whether there are circumstances that indicate that reunification is likely to be successful or unsuccessful and whether failure to order reunification is likely to be detrimental to the child." (§ 361.5, subd. (c)(3).) In determining likelihood of success, the court may

11

consider "[t]he failure of the parent to respond to previous services, the fact that the child was abused while the parent was under the influence of drugs or alcohol, a past history of violent behavior, or testimony by a competent professional that the parent's behavior is unlikely to be changed by services." (*Id.*, subd. (c)(4).)

Here, substantial evidence supports bypass of reunification services as to K.E. pursuant to section 361.5, subdivision (b)(5). K.E. is a child brought under dependency jurisdiction under section 300, subdivision (e). As we explained, substantial evidence supports the allegation that Mother and Father inflicted or reasonably should have known someone inflicted severe physical abuse on K.E. (*Ante*, at pp. 9–10.)

Nor was there competent evidence to show that services are likely to prevent reabuse or that failure to try reunification will be detrimental to the child. Where "neither parent was even willing to acknowledge that nonaccidental injury occurred, . . . it is difficult to imagine how any services would have been likely to prevent reabuse." (*In re Madison S.* (2017) 15 Cal.App.5th 308, 327.) Here, Mother and Father denied that K.E.'s injuries were a result of their failure to adequately supervise or protect him. They maintained his head injuries were accidental, and they had no explanation for other injuries. Briley testified that without identifying the cause of the injuries, the Department would not be able to adequately treat and assess the parents' behavior. Thus, there would be no adequate services that would prevent reabuse. Briley also testified that failure to try reunification would not be detrimental to K.E. He was only two months old at the time of the referral, and his "attachment [to his parents] is limited." Based on this evidence, there was no error in

12

concluding that services would likely be unsuccessful and that bypassing services would not be detrimental to K.E.

2. *Section 361.5, subdivision (b)(6)*

Under section 361.5, subdivision (b)(6), reunification services need not be provided where the court finds, by clear and convincing evidence, that "the child has been adjudicated a dependent pursuant to any subdivision of Section 300 as a result of . . . the infliction of severe physical harm to the child, [or] a sibling . . . by a parent . . . and the court makes a factual finding that it would not benefit the child to pursue reunification services with the offending parent." (§ 361.5, subd. (b)(6)(A).) "A finding of the infliction of severe physical harm . . . may be based on, but is not limited to, deliberate and serious injury inflicted to or on a child's body or the body of a sibling . . . of the child by act or omission of the parent." (*Id.*, subd. (b)(6)(C).)

In determining whether reunification services will benefit the child, the court "shall consider any information it deems relevant, including": (1) the specific act or omission comprising the severe physical harm inflicted on the child or the child's sibling, (2) the circumstances under which the abuse or harm was inflicted, (3) the severity of the emotional trauma, (4) any history of abuse of other children by the offending parent, (5) the likelihood that the child may be safely returned to the care of the offending parent within 12 months with no continuing supervision, and (6) whether the child desires to be reunified with the offending parent. (§ 361.5, subd. (i).) "The court shall read into the record the basis for a finding of . . . the infliction of severe physical harm under paragraph (6) of subdivision (b), and shall also specify the factual findings used to determine that the provision of reunification services to the offending parent or

13

guardian would not benefit the child." (*Id.*, subd. (k).) The court "shall not order reunification for a parent" under subdivision (b)(6) "unless the court finds by clear and convincing evidence, that reunification is in the best interest of the child." (*Id.*, subd. (c)(2).)

Substantial evidence supports the juvenile court's decision to bypass services as to both K.E. and M.E. pursuant to section 361.5, subdivision (b)(6). Evidence supports the court's finding that the parents' acts and omissions amounted to infliction of severe physical harm upon K.E. He suffered extensive head and brain injuries, and those injuries were not consistent with the parents' explanation for them. Furthermore, Mother and Father failed to seek appropriate medical care for K.E. During the November 2024 incident, the parents failed to take K.E. to the hospital after the choking incident, against EMS's advice. This was so even though their other daughter, D.E., passed away a year earlier from purportedly similar circumstances. K.E. also had wrist and rib fractures that were weeks old but were never treated. (See *Pablo S. v. Superior Court* (2002) 98 Cal.App.4th 292, 301 [failure to provide medical attention to a broken leg constituted infliction of serious injury by omission].) Mother and Father also did not call 911 and transported K.E. themselves to the hospital after his head and brain injury.

Substantial evidence also supports the juvenile court's finding that K.E. and M.E. would not benefit from reunification services. The evidence supports the first factor under section 361.5, subdivision (i)—the specific act or omission comprising of the severe physical harm—weighed against reunification services. Both parents did not seek appropriate medical care for K.E., as they left K.E.'s broken bones untreated, ignored the

14

advice of EMS for proper treatment after K.E. stopped breathing after a choking incident, and one or both parents may have inflicted K.E.'s head and brain injuries and/or the parents failed to do anything to protect him from such abuse.  As to the second factor—the circumstances under which the abuse was inflicted—the history regarding D.E.'s death is relevant because the parents were aware of the necessity of appropriate medical care, but failed to seek that care for K.E. and ignored medical advice from professionals.  As to the third factor, M.E. experienced emotional trauma due to her sibling being injured.  She lived in the same home when the injuries occurred, and another sibling passed away less than a year before.  Furthermore, as to the fifth factor, there was no likelihood the children could be safely returned to parents within 12 months.  Briley testified that the Department was unable to adequately treat the parents because the Department did not know the underlying cause of the injuries, and thus, the Department could not prevent reabuse.  Under these facts, there was no error in concluding reunification services would not benefit the children.

The juvenile court also did not err in finding reunification was not in the best interest of M.E. and K.E.  (§ 361.5, subd. (c)(2).)  The burden is on the parents to show that reunification services will be in the child's best interest.  (*In re T.R.* (2023) 87 Cal.App.5th 1140, 1148.)  "We review a juvenile court's assessment of what is in the child's best interest for an abuse of discretion."  (*In re Jayden M.* (2023) 93 Cal.App.5th 1261, 1273.)

Here, Briley opined that reunification was not in the best interest of M.E. and K.E. because reabuse could not be prevented without remedying the underlying issues causing the abuse.  Although there was evidence that M.E. had a "close and positive

attachment" to her parents, she would be placed with a close relative and could maintain her relationship with her parents. Furthermore, the close relationship did not outweigh the danger of potential abuse.  There was no abuse of discretion here.

DISPOSITION

The petitions for extraordinary writ are denied.

NOT TO BE PUBLISHED.


BALTODANO, J.


We concur:



YEGAN, Acting P. J.



CODY, J.

16

Matthew G. Guerrero, Judge

Superior Court County of San Luis Obispo

_____

Hallie S. Ambriz for Petitioner C.M. (Mother).

Linda L. Currey for Petitioner J.E. (Father).

No appearance for Respondent.

Jon Ansolabehere, County Counsel, Vincent M. Uberti, Deputy County Counsel, for Real Party in Interest.