Filed 5/23/14  In re Tristan W. CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re TRISTAN W., a Person Coming Under the Juvenile Court Law. | B251987 (Los Angeles County Super. Ct. No. CK77717) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. T.W., et al., Defendants and Appellants. | |

APPEAL from an order of the Superior Court of Los Angeles, Debra L. Losnick, Juvenile Court Referee.  Affirmed in part and reversed in part with directions.

Kate M. Chandler, under appointment by the Court of Appeal, for Defendant and Appellant T.W.

Marissa Coffey, under appointment by the Court of Appeal, for Defendant and Appellant Ser. R.

Tarkian & Associates, Arezoo Pichvai for Plaintiff and Respondent.

_____

T.W. (father) and Ser. R. (mother) appeal from a September 24, 2013 order terminating their parental rights as to Tristan W. under Welfare and Institutions Code section 366.26.[1]  Parents challenge the dependency court's finding that the Indian Child Welfare Act (ICWA) does not apply in this case.  Mother further contends the court erred in finding inapplicable the sibling relationship exception to termination of parental rights.  Father challenges the sufficiency of the evidence to support a finding of Tristan's adoptability.  Father also contends the court erroneously denied his request for a continuance of the section 366.26 hearing so Tristan's paternal grandmother could be evaluated as a possible placement.  We reverse for the limited purpose of directing the court to comply with ICWA's notice requirements.  In all other respects, we affirm.

## FACTS

In June 2009, the Department of Children and Family Services (Department) removed Tristan and his three half-brothers[2] from parents' custody and filed a petition under section 300 alleging mother and father physically abused the children, engaged in domestic violence, and abused alcohol.  The court detained the children and ordered the Department to investigate mother's possible Indian heritage and provide reunification services to the parents.  It later sustained a first amended petition.  The Department mailed ICWA notices to the Cherokee tribes on June 23, 2009, but copies of the notices and the return receipts do not appear in the record on appeal.  In July 2009, the Department received letters from the Cherokee Nation stating that Tristan was not considered an Indian child.  Another letter from the United Keetoowah Band of Cherokee Indians states that one of Tristan's half-brothers is not an Indian child, but makes no mention of Tristan.  At a hearing on August 1, 2011, the court concluded ICWA did not

---

[1] All further statutory references are to the Welfare and Institutions Code, unless otherwise indicated.

[2] Tristan is the only minor at issue in this appeal.

apply, stating "Apparently, I did not make an [ICWA] finding.  I haven't looked it up, but I know that I would have made it.  [¶]  In any event, I know this is not a case that [ICWA] applies to."

*Reunification Services to Parents and Visitation*

Father did not comply with the case plan and initially made no effort to visit Tristan.  The court terminated father's reunification services in September 2010.  Mother substantially complied with reunification services.  At the six-month review hearing in December 2009, the court granted mother unmonitored visits with the children, provided she remained alcohol and drug free, and father was not present during the visits.  Mother received reunification services for close to two years.  Even after the court terminated reunification services in May 2011, it permitted unmonitored overnight and weekend visits with the children.  Mother continued to participate in individual counseling, parenting classes, Alcoholics Anonymous, and random alcohol testing.  Continuing lapses in judgment and behavior, such as periodic alcohol and marijuana use, prevented her from regaining custody of her children.

The court originally set a selection and implementation hearing under section 366.26 for September 2011.  The hearing did not take place until two years later, in part because the court gave both mother and father additional opportunities for visitation and because of delays in obtaining approval of a prospective adoptive parent for Tristan.

*Foster Care and Adoptive Placements*

At the time mother's four children were originally detained in June 2009, one-year-old Tristan and his fourteen-year-old half-brother, Sem., were placed with the same foster parent, and the two other brothers were placed with a different foster family.  In October 2010, Tristan was evaluated for a speech delay and was identified at high risk for developmental delays.  He was around two and a half years old at the time and appeared

3

to be mentally and emotionally stable. Because Tristan had an issue with biting other small children in the home when he was frustrated, the Department began looking for a new foster home for Tristan. Faced with the prospect of Tristan's moving to a different foster home and his mother's wishes that Sem. remain with Tristan, Sem. became depressed and potentially suicidal. Sem. told a social worker he wanted to remain in the current foster home while the Department searched for a new home for Tristan.

Tristan and Sem. were moved to different foster homes in the summer of 2011. Tristan had some speech delays in the summer and fall of 2011, but they were being addressed through an individualized education program. Tristan was in good health and did well with Mrs. C., his new foster caregiver. After Mrs. C. expressed an interest in adopting Tristan, the foster agency initiated an adoptive home study, reporting at least twice that it expected final approval in May 2012. The Department was unaware of any problems or concerns with the approval process until July 2012, and in fact reported in its November 6, 2012 report that the home study was approved in September 2012. As late as January 31, 2013, the Department reported that Tristan was in a pre-approved adoptive home and his foster caregiver was participating in family therapy sessions addressing prospective adoption. By April 2013, the Department was scrutinizing Mrs. C.'s situation more closely, based on a 2009 domestic violence conviction and allegations that Mrs. C.'s daughter had physically abused Tristan. On May 8, 2013, it determined that Mrs. C. was not a placement option, in part because of concerns about Mrs. C.'s suitability as either a foster or adoptive parent.

In May 2013, Tristan was placed with Mrs. B., who had been pre-approved for adoption and had expressed an interest in adopting him. In determining Tristan's permanent plan for adoption, the Department considered and rejected a number of other alternatives, including Tristan's maternal aunt and uncle, as well as the father of Tristan's two middle siblings. The Department also considered Tristan's paternal grandmother, who lives in Michigan, but noted she had never visited or tried to call Tristan throughout the dependency proceedings. The Department also noted in a July 16, 2013 report if Mrs. B. adopted Tristan, he would have the opportunity to maintain a significant ongoing

4

relationship with Sem., and if the adoptive placement did not work out, it would request an evaluation of his paternal grandmother in Michigan. In a September 2013 report, the Department recommended excluding paternal grandmother as an adoptive parent, based on her lack of interest or any meaningful connection to Tristan.

*Sem.'s Relationship with Tristan and his Request to Participate in the 366.26 Hearing*

Although Tristan has known Sem. his entire life, there is a thirteen year age gap between the two boys. Tristan turned 6 while this appeal was pending, and Sem. is 19. The two lived together until the summer of 2011. In November 2011, the court deemed all four siblings a sibling set and ordered sibling visitation at least twice a month. All four siblings had monitored visits with their mother twice a month for about six months, but then between April and October 2012, mother visited Tristan twice, and Sem. visited Tristan only once. Between November 2012 and January 2013, Sem. visited with Tristan about twice a month, but missed a number of visits either because he did not show up or did not return the social worker's phone calls to confirm the visit. Mrs. B. has indicated she will support ongoing contact between Tristan and Sem.

*Selection and Implementation Hearing*

The court held the section 366.26 hearing on September 24, 2013. All parties, including mother, father, and Sem. were represented by counsel at the hearing. The court denied father's request for continuance to allow an interstate investigation into the suitability of paternal grandmother as a placement option. The court also rejected mother's argument that the relationship between Tristan and Sem. was significant enough to warrant application of the sibling relationship exception to termination of parental rights.

5

A. **ICWA**

Appellants contend the Department failed to comply with the notice requirements of ICWA and the court erred in finding ICWA inapplicable. The Department concedes that remand is necessary for proper ICWA notices. We agree.

We apply the substantial evidence standard of review to the trial court's finding that ICWA does not apply. (*In re Asia L.* (2003) 107 Cal.App.4th 498, 506.) ICWA is a federal statutory scheme "designed to promote the stability and security of Indian tribes and families by establishing minimal standards for removal of Indian children from their families and placement of such children 'in foster or adoptive homes which will reflect the unique values of Indian culture, and by providing for assistance to Indian tribes in the operation of child and family service programs.'" (*In re Marinna J.* (2001) 90 Cal.App.4th 731, 734 (*Marinna J.*), quoting 25 U.S.C. § 1902.) Whenever the dependency court knows or has reason to know that an Indian child is involved in a dependency proceeding, notice must be given to the tribe, and the tribe's response will determine if the child is an Indian child. (25 U.S.C. § 1912(a); *In re Jose C.* (2007) 155 Cal.App.4th 844, 848.) "The notice must include the names of the child's ancestors and other identifying information, if known, and be sent registered mail, return receipt requested." (*In re Brooke C.* (2005) 127 Cal.App.4th 377, 384.) Copies of the notices sent, the returned receipts, as well as any correspondence received from the tribes, must be filed with the court. (Cal. Rules of Court, rule 5.482(b); *Marinna J.*, *supra*, 90 Cal.App.4th at pp. 739-740, fn. 4.)

The court's determination that ICWA did not apply to the proceedings was not supported by substantial evidence because the Department did not file the notices sent to various tribes after mother stated that she or father may have some American Indian ancestry. It is unclear whether the Department sent a notice to the Bureau of Indian Affairs, and the response from the United Keetoowah Band of Cherokee Indians raises

6

concerns that the Department's notice may have identified one of Tristan's half-siblings, but not Tristan. Without evidence that the Department had complied with its legal obligation to notify the relevant tribal entities of the dependency proceeding involving Tristan, the court lacked substantial evidence to support a finding that ICWA did not apply. Because compliance with ICWA is jurisdictional, we reverse the order terminating parental rights and remand for the limited purpose of ensuring compliance with ICWA's notice requirements. If no tribe comes forward, the dependency court shall reinstate its order terminating parental rights. (*Tina L. v. Superior Court* (2008) 163 Cal.App.4th 262, 268.)

### B.      Sibling Exception to Termination of Parental Rights

Mother contends it was error to terminate her parental rights because substantial evidence supports the application of the sibling relationship exception under section 366.26, subdivision (c)(1)(B)(v), in light of the relationship between Tristan and his oldest brother. We agree with the court's finding that the evidence regarding the extent and nature of that relationship is insufficient to meet the legal requirements of the sibling relationship exception.

We apply the substantial evidence standard of review when a party challenges the dependency court's determination that an exception under section 366.26, subdivision (c)(1)(B) does not apply. (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947 (*L.Y.L.*); *In re Autumn H.* (1994) 27 Cal.App.4th 567, 576; compare *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314–1315 [applying both substantial evidence and abuse of discretion standards of review in a two-step process]; *In re Aaliyah R.* (2006) 136 Cal.App.4th 437, 449 [abuse of discretion standard of review].)[3]  If supported by

_____

[3] "The practical differences between the two standards of review [substantial evidence and abuse of discretion] are not significant. '[E]valuating the factual basis for an exercise of discretion is similar to analyzing the sufficiency of the evidence for the ruling . . . . Broad deference must be shown to the trial judge. The reviewing court should

7

substantial evidence, the judgment or finding must be upheld, even though substantial evidence may also exist that would support a contrary result and the dependency court might have reached a different conclusion had it determined the facts and weighed credibility differently. (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 228.) "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court. [Citations.]" (*In re Matthew S.* (1988) 201 Cal.App.3d 315, 321.)

The sibling relationship exception applies when a court finds a compelling reason that terminating parental rights to permit adoption would be detrimental to a child because doing so would cause "substantial interference with a child's sibling relationship, taking into consideration the nature and extent of the relationship, including, but not limited to, whether the child was raised with a sibling in the same home, whether the child shared significant common experiences or has existing close and strong bonds with a sibling, and whether ongoing contact is in the child's best interest, including the child's long-term emotional interest, as compared to the benefit of legal permanence through adoption." (§ 366.26(c)(1)(B)(v).) "To show a substantial interference with a sibling relationship the parent must show the existence of a significant sibling relationship, the severance of which would be detrimental to the child. Many siblings have a relationship with each other, but would not suffer detriment if that relationship ended. If the relationship is not sufficiently significant to cause detriment on termination, there is no

interfere only "'if [it] find[s] that under all the evidence, viewed most favorably in support of the trial court's action, no judge could reasonably have made the order that he did.' . . .'" [Citations.] However, the abuse of discretion standard is not only traditional for custody determinations, but it also seems a better fit in cases like this one, especially since the statute now requires the juvenile court to find a 'compelling reason for determining that termination would be detrimental to the child.' (§ 366.26, subd. (c)(1).) That is a quintessentially discretionary determination. The juvenile court's opportunity to observe the witnesses and generally get 'the feel of the case' warrants a high degree of appellate court deference." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351, first bracketed insertion added.)

substantial interference with that relationship." (*L.Y.L., supra,* 101 Cal.App.4th at p. 952, fn. omitted.)

Here, the sibling relationship between Tristan and Sem. was not sufficiently significant to cause such detriment to Tristan as to outweigh the benefit permanency would bring to Tristan's life. Tristan's long-term emotional interests, due to his young age, are better served by the permanency of adoption rather than by continued sibling contact. Tristan and Sem. lived in the same home from the time Tristan was born until the summer of 2011; Tristan was an infant and Sem. was a teenager during their time living together. Sem.'s visits were sporadic, and Tristan was sad and disappointed when Sem. did not show up for scheduled visits. There was also evidence that the age difference between Tristan and Sem. reduced the benefits Tristan could gain from a continued relationship with his oldest brother. Viewing the evidence in the light most favorable to the court's findings, any benefit from their sibling relationship was dramatically reduced by their age difference, dissipated over the time they lived in separate homes, and became further attenuated as Sem. repeatedly missed scheduled visitation with Tristan. In addition, the Department reported that Tristan's prospective adoptive parent was open to continuing visits between Tristan and Sem. Even though there was no post-adoption enforcement mechanism in place, termination of parental rights did not necessarily foreclose the continuation of the sibling relationship. Although Tristan looked forward to his visits with his oldest brother, the trial court reasonably could infer the detriment of a possible—though far from certain—end to those visits was minimal compared to the benefit of a permanent home.

## C.     Tristan's Adoptability

Father contends that the court's findings about Tristan's adoptability are not supported by substantial evidence. We disagree. We apply the substantial evidence standard of review to the trial court's finding of adoptability and termination of parental

9

rights, viewing the evidence in the light most favorable to the court's decision. (*In re Josue G.* (2003) 106 Cal.App.4th 725, 732.)

In order to terminate parental rights at the selection and implementation hearing, the court must find clear and convincing evidence that the child is adoptable. (§ 366.26(c); *In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1649–1650.) "All that is required is clear and convincing evidence of the likelihood that adoption will be realized within a reasonable time." (*In re Zeth S.* (2003) 31 Cal.4th 396, 406.) The court must focus on whether the child's age, physical condition, and emotional state make it difficult to find a person willing to adopt him. (*In re Sarah M.*, *supra*, 22 Cal.App.4th at p. 1649.) "[A] prospective adoptive parent's willingness to adopt generally indicates the minor is likely to be adopted within a reasonable time either by the prospective adoptive parent or by some other family." (*Id.* at p. 1650, italics omitted.) However, "it is not necessary that the minor already be in a potential adoptive home or that there be a proposed adoptive parent 'waiting in the wings.' [Citations.]" (*Id.* at p. 1649; see also, § 366.26, subd. (c)(1).) It is also not necessary for the court to assess the suitability of the prospective adoptive home, if it has found the child generally adoptable. (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1526 (*I.W.*).) But if the court's finding of adoptability is based solely on the willingness of a particular family to adopt him, the court must determine whether there is a legal impediment to adoption. (*Ibid.*)

Here, the record contains substantial evidence supporting the court's finding that Tristan is generally adoptable. This dependency proceeding began in 2009 when Tristan was just over a year old. Although early reports by the Department noted issues with biting and developmental delays, it does not appear that any of the issues were atypical of a toddler working through disruptive changes in his life. Concerns about Tristan's speech delays were addressed, and he received consistent psychological and developmental support. He was under the care of three different foster parents, and given his young age, he was emotionally stable in each placement, including the time he was living with Mrs. C. The barriers to Tristan's planned adoption by Mrs. C. were unrelated to his age, or physical or emotional health. Ultimately, the Department cited problems uncovered in

Mrs. C.'s homestudy that led it to conclude, almost a full year after she had expressed interest in adopting Tristan, that she was no longer a placement option. Nothing about the situation raised any concerns about Tristan's adoptability.

Shortly after deciding against permanent placement with Mrs. C., the Department placed Tristan with Mrs. B., who was pre-approved as an adoptive parent and was highly committed to adopting Tristan. At the July 6, 2013 hearing, Tristan was having transition issues and the court continued the hearing. By the next hearing in September 2013, Tristan had adjusted well and was emotionally bonded with Mrs. B. Parents argue that the court should have ordered psychological testing and allowed more time to ensure his current caretaker will in fact adopt him, but because substantial evidence supports Tristan's general adoptability, neither was legally necessary. (*I.W.*, *supra,* 180 Cal.App.4th at p. 1526 [if the court's finding of adoptability is based solely on the willingness of a particular family to adopt a child, the court must determine whether there is a legal impediment to adoption.].) The dependency court noted the foster parents'[4] presence in the courtroom and their joy at coming one step closer to adopting Tristan. Tristan is a well-adjusted child who is not only adoptable, but deserves to be freed for adoption without delay. There is substantial evidence to support the trial court's finding that Tristan is adoptable.

## D. Denial of Continuance

The dependency court did not abuse its discretion in denying father's request for a continuance so that the Department could evaluate placing Tristan with his paternal grandmother in Michigan. We review the denial of a continuance for abuse of discretion. (*In re Karla C.* (2003) 113 Cal.App.4th 166, 180.) In dependency proceedings, "no continuance shall be granted that is contrary to the interest of the minor. In considering

---

[4] Although the court used the plural "foster parents," only Mrs. B. was identified as a prospective adoptive parent and the reference to a second foster parent is unclear.

11

the minor's interests, the court shall give substantial weight to a minor's need for prompt resolution of his or her custody status, the need to provide children with stable environments, and the damage to a minor of prolonged temporary placements." (§ 352, subd. (a).)

Father's counsel first requested consideration of paternal grandmother as a placement option more than four months earlier, at the May 7, 2013 hearing, after it became clear to the court and the Department that the planned placement with Mrs. C. was no longer viable. At the time, the court expressed concern that such a placement would impact Tristan's relationship with his older brother, because the grandmother lived in Michigan. "My first choice, if we are going to make a move, would be to place with his brother, if possible. I know he would like to spend more time and have his brother with him." Also, the Department recommended excluding paternal grandmother as a potential adoptive parent based on her lack of engagement. With these facts, we cannot say the court abused its discretion in denying father's request to continue the selection and implementation hearing.

## DISPOSITION

The order terminating parental rights is reversed for the limited purpose of permitting notifying appropriate tribal entities in accordance with ICWA.  In all other respects, the order is affirmed.


KRIEGLER, J.


We concur:


TURNER, P. J.


MINK, J.*

---

*    Retired judge of the Los Angeles County Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.